### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BAY COLONY CONDOMINIUM ASSOC. | : | Civil A. No. 11-4865(NLH-JS) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| SCOTTSDALE INSURANCE COMPANY, | : | |
| COMPASS INVESTIGATORS & | : | |
| ADJUSTERS, INC., and | : | |
| BRUCE D. GUTTENPLAN | : | |
| | : | |
| Defendants. | : | |

**APPEARANCES:**

STEVEN J. BROG
PERSKIE MAIRONE BROG & BAYLINSON PC
1201 NEW ROAD
SUITE 204
LINWOOD, NJ 08221
          *On behalf of Plaintiff,*

GEORGE A. PRUTTING, JR.
PRUTTING & LOMBARDI
701 SOUTH WHITE HORSE PIKE
AUDUBON, NJ 08106
          *On behalf of Defendants.*


**HILLMAN, District Judge**

     Presently before the Court are: (1) the Motion for Partial

Summary Judgment [Doc. No. 11] of Plaintiff Bay Colony

Condominium Association ("Bay Colony," "the Association," or

"Plaintiff"), and (2) the Cross-Motion for Summary Judgment [Doc.

No. 16] of Defendants Scottsdale Insurance Company

("Scottsdale"), C.I.A. Adjusters & Investigators, Inc.'s

("C.I.A.") and Bruce D. Guttenplan ("Guttenplan")(collectively

hereinafter "Defendants").  For the reasons that follow,
Plaintiff's Motion will be denied, and Defendants' Cross-Motion
will be granted in part and denied in part.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This matter involves an insurance coverage dispute stemming
from a fire that occurred at a two-building condominium complex
in Atlantic City, New Jersey.[1] (Pl.'s Mot. Partial Summ. J., Ex.
1, Statement of Material Facts Not In Dispute("Pl.'s Statement of
Facts")¶ 1; Defs.' Resp. Pl.'s Statement of Material Facts
("Defs.' Statement of Facts") ¶1.) Plaintiff Bay Colony is a non-
profit corporation responsible for the maintenance and oversight
of the condominium complex.  (Pl.'s Mot. Partial Summ. J., Ex.
10, Compl. for Decl. J. & Other Relief & Jury Demand ("Compl.")
¶1.) Defendant Scottsdale entered into an insurance agreement

_____

[1] The Court has subject matter jurisdiction over this action
pursuant to 28 U.S.C. § 1332.   Section 1332 provides, in
relevant part:

> The district courts shall have original jurisdiction of
> all civil actions where the matter in controversy exceeds
> the sum or value of $75,000, exclusive of interest and
> costs, and is between citizens of different States[.]

28 U.S.C. § 1332(a)(1).  In the instant case, there is complete
diversity among the parties.  Plaintiff Bay Colony is incorporated
and maintains its principal place of business in New Jersey.
Defendant Scottsdale is incorporated in Ohio and maintains its
principal place of business in Arizona.  Defendant C.I.A. is
incorporated and maintains its principal place of business in New
York, and Defendant Guttenplan is a citizen of New York.  Moreover,
the amount in controversy in this dispute exceeds the requisite
$75,000.

with Plaintiff to provide coverage for the condominium complex.
(Def. C.I.A. Am. Notice of Removal ("Notice of Removal") [Doc.
No. 7] ¶3.) Defendant C.I.A. is a company engaged in the business
of investigating insurance claims, and Defendant Guttenplan is a
C.I.A. employee. (Id. ¶¶4,7; Defs.' Cross-Mot. Summ. J., Ex. O,
Certification of Bruce D. Guttenplan ("Guttenplan Cert.") ¶1.)

In 1976, Bay Colony recorded its Master Deed, which, *inter
alia*, defined specific terms and delineated the responsibilities
of the Condominium Association and the individual condominium
unit owners. (Pl.'s Mot. Partial Summ. J., Ex. 3, 1975 Master
Deed Creating & Est. Bay Colony Condo. ("Original Master Deed").)
Section 10 of the Master Deed provided that the Association would
insure the entire condominium complex, including both the
parameters of the individual units and the "common elements" of
the building. (Id. at Art. I, § 10(A).) The Master Deed also
provided that an affirmative vote of at least 75% of the
Association's members was required to amend any part of its
contents. (Id. at Art. XV.)

On August 4, 2008, the Condominium Association sent a letter
to the individual unit owners requesting their vote on an
amendment to the Master Deed that would reduce the cost of the
Association's insurance obligations. (Defs.' Cross-Mot. Summ. J.,
Ex. J, 08/04/08 Letter Re: Proposed Am. Master Deed.) The text
of the letter stated as follows:

> The way the Master Deed document is written, Bay Colony continues to be at risk with increasing insurance premiums. . . . Where the problem lies is that the documents clearly and unequivocally require the Association to insure everything except [the] owner's personal property. That is the provision that must be addressed. In the early days it was felt that the Association was in a better position to insure everything and should act as the agent for the unit owners even in adjusting damage to the unit itself. These days that is obviously not the case and the Association does not wish to be responsible for individual unit owner property damage or insurance.

(Id.) Bay Colony therefore proposed an amended definition of a "unit" that included window and door frames, as well as "everything that is within the unit itself, [including] the heating, air conditioning and utility lines that exclusively serve the unit." (Id.) This amendment was thereafter adopted by the requisite percentage of the Association's members, and properly recorded in Atlantic County in October of 2008. (Defs.' Cross-Mot. Summ. J., Ex. H, Recorded Bay Colony Condo. Assoc. Am. Master Deed ("Am. Master Deed").)

Section 10 of the Amended Master Deed explicitly stated that the Association was only obligated to insure the common elements of the buildings, and that the unit owners were individually responsible for purchasing insurance to cover the boundaries of their separate units. (Id. at §§ 10(A)(1),10(B)(1)&(2).) The amended document also contained the aforementioned altered definition of a "unit," which now included: all framing; heating, plumbing, ventilating, and air conditioning systems; electrical

4

and cable television wiring; circuit breakers and outlets; equipment; appliances; and machinery "to the extent that they serve[d] []individual Unit[s]" of the building. (Id. at § 1E(2).) In tandem with the new definition of a "unit," the Amended Master Deed likewise contained a narrowed definition of the "common elements" of the building. As amended, "common elements" under the deed only included "common systems and equipment, including mechanical, electrical, plumbing, ventilating, sprinkler, and fire suppression systems" that serviced all units and that did not fall within the boundaries of any individual unit. (Id. at § 3A(1)(n).)

On February 19, 2009, Bay Colony sent a letter to all unit owners advising them of the changes made to the Master Deed, and attached a copy of the amended document. (Defs.' Cross-Mot. Summ. J., Ex. L, 02/19/09 Letter Re: Approved Master Deed Change.) In this same letter, the Association "strongly recommended" that unit owners provide a copy of the Amended Master Deed to their individual insurance agents to ensure that they maintained insurance coverage in compliance with the new provisions. (Id.)

Bay Colony thereafter purchased its own insurance policy ("the Policy") from Defendant Scottsdale to obtain coverage for the portions of the building it was obligated to insure. (Pl.'s Mot. Partial Summ. J., Ex. 2, Aff. Joseph Simonetta in Supp. of

Pl.'s Mot. Partial Summ. J. ("Simonetta Aff.")¶33.)  The terms of
the Policy provided that both buildings in the condominium
complex would receive blanket building coverage, and that
"business income, bulkheads, pilings, boardwalks and railings"
would also be covered. (Pl.'s Mot. Partial Summ. J., Ex. 9,
Scottsdale Ins. Co. Comm. Prop. Coverage Part Supplemental Decl.
("Scottsdale Supp. Decl.").) The limit of the Policy was set at
$1,974,000.00. (Id.)

Most relevant to the instant dispute, the Policy explicitly
stated that Scottsdale would provide Bay Colony with coverage
for: "direct physical loss of or damage to Covered Property at
the premises[.]"  (Pl.'s Mot. Partial Summ. J., Ex. 6, Condo.
Assoc. Coverage Form ("Scottsdale Ins. Policy") at 1.)  According
to the Policy's terms,"covered property" was defined to include
both "the building or structure" and "permanently installed
machinery and equipment" within it. (Id.)  The Policy also
indicated that Scottsdale would pay for any "direct physical
damage" to machinery or equipment that was "the direct result of
an 'accident.'" (Id. at 16.)

In the event that Scottsdale and Bay Colony disagreed as to
the value of any loss or damage to covered property, the
insurance agreement provided that the two entities could choose
to partake in an appraisal.  The appraisal process was described
in the text of the Policy as follows:

> If [Scottsdale] and [Bay Colony] disagree on the value of
> the property or the amount of loss, either [party] may
> make written demand for an appraisal of the loss.   In
> this event, each party will select a competent and
> impartial appraiser.   The two appraisers will select an
> umpire.   If they cannot agree, either may request that
> selection be made by a judge of a court having
> jurisdiction.   The appraisers will state separately the
> value of the property and amount of loss.   If they fail
> to agree, they will submit their differences to the
> umpire.   A decision agreed upon by any two will be
> binding.

(Id. at 9.)

On September 2, 2009, a fire occurred at the Bay Colony
condominium complex.  (Defs.' Cross-Mot. Summ. J., Ex. A.,
09/02/09 Atl. City Fire Dep't Rep.) The fire allegedly affected a
significant portion of the building, damaging a majority of the
complex's common elements and individual units.  (Simonetta Aff.
¶5.) Bay Colony immediately notified Scottsdale of the fire, and
retained the services of a licensed insurance adjuster to address
its loss claim.[2]  (Compl.¶¶20,21.)  Scottsdale retained Defendant
Guttenplan to handle the insurance claim. (Defs.' Cross-Mot.
Summ. J., Ex. G, Decl. Appraisers; Guttenplan Cert. ¶1.)

Over the course of several months, the parties attempted to
reach a mutually-agreed upon amount reflecting Bay Colony's loss
due to the fire. (See generally Compl. ¶¶19-68.) They were unable
to do so, however, and therefore opted to partake in an appraisal

---

[2] Plaintiff initially retained Leonard Orloff as their
representing agent.  (Compl. ¶21.)  In June of 2010, however,
Carlos Rodriguez replaced Orloff as the insurance agent
representing Bay Colony.  (Pl.'s Mot. Partial Summ. J., Ex. 11,
Aff. of Carlos Rodriguez("Rodriguez Aff.")¶2.)

in June of 2011. (Rodriguez Aff. ¶¶4-6.)  In accordance with the appraisal procedure set forth in the Policy, Bay Colony chose Carl Rodriguez ("Rodriguez") to serve as its appraiser, and Scottsdale retained the services of Frank Antonucci ("Antonucci"). (Id. at ¶2; Simonetta Aff. ¶15.)  Rodriguez and Antonucci selected Douglas MacKinney ("MacKinney") as their umpire.  (Id. ¶16; Rodriguez Aff. ¶6.) Rodriguez and Antonucci both submitted monetary estimates to MacKinney reflecting what they believed to be the proper amount of Bay Colony's loss due to the fire.  (Id. ¶5.) Rodriguez avers that he only submitted an amount reflective of the damage done to the common elements of the building.  (Id.) Notably, he included damage to the electrical, HVAC, plumbing, and framing of the building in his estimate, as he considered these items to be insured common elements.  (Id.) According to Rodriguez, "[a]ll of my numbers related to components of the systems . . . [that were] located in common areas and serv[ed] all units, and components [that ran] between units (such as wiring and duct work)." (Id.)  Antonucci, on the other hand, did not include any damage done to these items in his estimate because he did not believe them to be common elements. (Defs.' Cross-Mot. Summ. J., Ex. M, 05/11/11 MacKinney Letter.)

As the "umpire" to the dispute, MacKinney assessed both parties' submitted estimates and conducted his own inspection of the property. (Id.) In July of 2011, MacKinney released a report

8

stating that Bay Colony's total loss due to the fire was $996,547.81. (Id.) In his report, MacKinney separated the total amount of loss into two categories: (1) loss that occurred to common elements owned by the Condominium Association, and (2) loss that occurred to "non-condo association unit components" attributable to the individual unit owners. (Id.) MacKinney allocated $335,530.04 to the common elements category, and $661,017.78 to the unit components category. (Id.) With regard to electricity, HVAC, plumbing, framing, and architectural and engineering fees that could be attributed to both categories, MacKinney divided the amount of loss between the two as follows:

| ITEM | COMMON ELEMENTS | UNIT COMPONENTS |
|---|---|---|
| Electric | $10,000.00 | $43,520.00 |
| HVAC | $0.00 | $67,960.00 |
| Plumbing & Heating | $0.00 | $32,070.00 |
| Framing | $7,245.00 | $28,707.91 |
| Architectural & Engineering Fees | $24,388.85 | $46,811.15 |
| **TOTAL** | $41,388.85 | $219,069.06 |

(Id.; Simonetta Aff. ¶41.)

To date, Scottsdale has paid Bay Colony approximately $291,000.00 in insurance proceeds.[3]  Bay Colony asserts, however, that it is entitled to further proceeds from Scottsdale because

---

[3] The actual amount that Scottsdale has paid to Bay Colony at this point in time remains in dispute between the parties.  On its part, Plaintiff contends that it has received $291,006.00 from Scottsdale to date.  (Simonetta Aff. ¶8.)  Defendants, on the other hand, aver that they have presently paid $291,307.25 to Plaintiff. (Defs.' Cross-Mot. Summ. J. at 2.)

MacKinney based his finding on an incorrect definition of "common elements" that did not match the one provided in the Amended Master Deed and applicable statutory law. (Pl.'s Statement of Facts ¶6; Simonetta Aff. ¶¶17,19; Rodriguez Aff. ¶6; Compl. ¶¶81,82.)  Bay Colony therefore alleges that it should receive the $219,069.06 amount that MacKinney allocated to the unit owners for damage done to the building's electricity, HVAC, plumbing, and framing. (Simonetta Aff. ¶42.) Bay Colony further avers that the estimated actual cost to rebuild the common elements in the condominium complex is $750,000.00, and that it is entitled to coverage for common element reconstruction up to the $1,974,000.00 limit of its Policy.  (Id. ¶¶9,37.)

Plaintiff filed its Complaint in New Jersey state court on August 2, 2011.  (Notice of Removal ¶1.)  Defendant C.I.A. removed the case to federal court on August 24, 2011.  (Id.)  In its Complaint, Plaintiff asserts the following five counts against Defendants: (1) a Declaratory Judgment in its favor indicating that Scottsdale has a duty to provide it with coverage for the full amount of common element losses (Count I); (2) Breach of Contract (Count II); (3) Breach of the Implied Covenant of Good Faith and Fair Dealing (Count III);(4) Bad Faith Claims Handling (Count IV); and (5) Violation of the New Jersey Consumer Fraud Act (Count V).[4]  On March 9, 2012, Plaintiff filed the

---

[4]  Counts I, II, and III are solely asserted against Defendant Scottsdale, whereas Counts IV and V allege claims against all three Defendants.

instant Motion for Partial Summary Judgment as to Count I of its
Complaint, seeking a declaratory judgment in its favor in the
amount of $219,069.06.  Defendants filed a Cross-Motion for
Summary Judgment on April 13, 2012.  Plaintiff replied to
Defendants' Cross-Motion for Summary Judgment on April 20, 2012.
On November 14, 2012, Defendants C.I.A. and Guttenplan
supplemented their Cross-Motion for Summary Judgment with
additional documentation.  That same day, Plaintiff responded in
opposition, thereby making this matter ripe for judicial
consideration.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where the Court is satisfied
that "the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ.
P. 56(c).

An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the nonmoving
party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  A fact is "material" if, under the governing
substantive law, a dispute about the fact might affect the
outcome of the suit.  Id.  In considering a motion for summary
judgment, a district court may not make credibility

determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

Notably, "[t]he rule is no different where there are cross-motions for summary judgment." Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008). The Third Circuit has stated that "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and

determination whether genuine issues of material fact exist.'" Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.    DISCUSSION

Plaintiff seeks summary judgment with respect to Count I of its Complaint requesting a declaratory judgment in its favor on the grounds that there is no issue that the rough carpentry and HVAC, electrical, heating, and plumbing systems are all insured under the Master Deed and Policy.  More specifically, Plaintiff contends that these items constitute "common elements" for which Bay Colony was required to obtain insurance coverage under the Amended Master Deed, and that these items are considered "covered equipment" under the terms of the Policy.  (Pl.'s Br. Supp. Mot. Summ. J. 4-7.)  Plaintiff further avers that the architectural and engineering expenses that it incurred as a result of the fire were directly derivative of damages sustained to common elements of the condominium complex, and that it therefore is likewise entitled to insurance coverage for these fees as well. (Pl.'s Statement of Facts ¶30.) Defendants, on the other hand, cross-move for summary judgment on the basis that these items are not "common elements" that must be insured under the Amended Master Deed, and are likewise not subsumed within the definition of "covered equipment" under the Policy. (Defs.' Resp. Opp'n 17-18.)[5]

---

[5] In the body of their Cross-Motion for Summary Judgment, Defendants cursorily allege as follows:

### A. "Common Elements" Under the Amended Master Deed and the New Jersey Condominium Act

The Amended Master Deed is clear that Bay Colony was only required to obtain insurance coverage for the common elements of the condominium complex, and the individual unit owners were responsible for insuring the extent of their individual units:

> The Board shall obtain . . . property insurance on the Common Elements in an amount equaling replacement value . . . If the damage is only to those parts of a unit for which the unit owner bears the responsibility for payment

---

> Plaintiff's claimed items for damage are considered part of the individual "units" and not part of the "common elements," as those terms were re-defined under the Amendment to the Master Deed.  Hence, [] Plaintiff's Complaint in its entirety must be dismissed against Defendant, Scottsdale Insurance Company.

(Defs.' Cross-Mot. Summ. J. 27-28.) If interpreted literally, this language appears to indicate that Defendants are requesting dismissal of all five counts asserted against Defendant Scottsdale in Plaintiff's Complaint.

As an initial matter, this matter is presently before the Court on summary judgment.  A grant of summary judgment on a claim and the dismissal of a claim are procedurally distinct.  See Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119, 121 n.2 (3d Cir. 1999) ("[T]he grant of summary judgment and the dismissal of the complaint are inconsistent procedurally.  The resolution of a motion for summary judgment does not lead to a dismissal of the complaint, only the grant or denial of summary judgment.").

Moreover, even if the Court were to disregard Defendants' references to the dismissal of Plaintiffs' claims and handle them as a request for a grant of summary judgment, Defendants' request would nonetheless be denied because their Cross-Motion for Summary Judgment in no way addresses Plaintiff's claims made in Counts II, III, IV, and V.  Rather, the context of Defendants' Motion is solely limited to Plaintiff's request for a declaratory judgment regarding the additional insurance coverage alleged in Count I. Given that Defendants have not sufficiently represented to the Court why they are entitled to summary judgment in their favor on Counts II through V, the Court solely limits its present discussion to whether either party is entitled to summary judgment on Count I. As such, Defendants' request as to the remaining four counts is denied without prejudice with leave to re-file at a later date.

> for and performance of maintenance and repair then that
> owner shall be responsible to bear the cost of and
> perform the reconstruction and repair. Each unit owner
> shall be responsible to obtain physical damage insurance
> to cover all elements of the individual unit[.] Whether
> or not the unit owner has maintained an insurance
> policy[,] all repairs to individual units shall be the
> responsibility of the unit owner only.

(Am. Master Deed. §§ 10A(1), 10B(1)&(2).)  As such, prior to

assessing the scope of the Policy at issue, the Court must

consider whether the building's framing, HVAC, electrical,

heating, and plumbing systems constituted "common elements" for

which Plaintiff was required to obtain insurance coverage in the

first instance.

"Whether an item is a common element 'may be ascertained by

examination of the statutory definition and master deed." Soc'y

Hill Condo. Assoc., Inc. v. Soc'y Hill Assoc., 789 A.2d 138, 142

(N.J. Super. 2002) (citing Siller v. Hartz Mountain Assoc., 461

A.2d 568, 574(N.J. 1983)).[6]  In the instant case, the relevant

provision of the New Jersey Condominium Act defines "common

elements" to include:

---

[6] On this point, Defendants assert that the Court need only
consider the provisions of the Amended Master Deed — and not the
New Jersey statute — because "the statute is only to be used to
determine what a common element is when the Master Deed does not
specifically set forth how a particular element is designated."
(Defs.' Resp. at 19.)  Defendants' assertion, however, is
incorrect.  Rather, New Jersey law dictates that "the phrase
'common elements' as used in the master deed must yield to the
statutory definition of 'common elements' as set forth in
N.J.S.A. § 46:8B-3d(ii)." Ellenheath Condo. Assoc., Inc. v.
Pearlman, 683 A.2d 582, 583 (N.J. Super. 1996) (citing N.J.S.A. §
46:8B-3d(ii), which mandates the primacy of the statutory
definition).  As such, the Court shall consider the definition of
"common elements" provided by both the statutory text and the
relevant Amended Master Deed.

> (ii) the foundations, structural and bearing parts,
> supports, [and] main walls . . . excluding any
> specifically reserved or limited to a particular unit or
> group of units; [and]
> . . .
> (v) installations of all central services and
> utilities[.]

N.J.S.A. § 46:8B-3 (emphasis added).

Similarly, Plaintiff's Amended Master Deed specifically defines "common elements" in the Bay Colony condominium complex to include "common systems and equipment, including mechanical, electrical, plumbing, ventilating, sprinkler and fire suppression systems." (Am. Master Deed § 3A(1)(n).) The deed cabins the scope of this definition, however, by providing that such items are not considered common elements if they are found within the boundaries of an individual "unit." (Id. § 3a(1).) A unit, in turn, is defined in the deed, in relevant part, as follows:

> [T]o the extent that they serve an individual Unit only
> and not any other Unit or any portion of the Common
> Elements:
> (1) So much of the common heating, plumbing, ventilating
> and air conditioning systems as extends from the interior
> surface of the walls, floors or ceiling into the Unit; and
> (2) All electrical wires which extend from the interior
> surface of walls, floors or ceilings into the Units and
> fixtures, switches, outlets and circuit breakers; and
> (3) All cable television wiring which extends from the
> interior surface of the walls, floors or ceilings into
> the Unit; and
> . . .
> (6) All equipment, appliances, machinery, mechanical or
> other systems whether or not same are located within or
> without the Unit including . . . the heat pumps or HVAC
> units located on concrete pads upon the Common Elements
> and window or wall sleeve air conditioning units, if
> any[.]

(<u>Id.</u> § 1E(2)(1-6)(emphasis added).) Essentially, according to the Amended Master Deed, if an item is part of a system's central line, then it is considered to be a common element. However, once the item breaks off from the central line and provides service or energy to an individual unit, it is deemed to be part of the unit. Stated differently, the wiring and piping attributable to individual units are the arteries stemming from the main power sources at the heart of the building.

Based on the definitions provided by N.J.S.A. § 46:8B-3 and the Amended Master Deed, Plaintiff asserts that the buildings' electric, HVAC, plumbing, heating, and framing are common elements for which Bay Colony was required to obtain insurance coverage. Both the Amended Master Deed and the statute make clear, however, that common elements are solely comprised of central power sources that service all units. The record here indicates that the items for which Plaintiff seeks additional insurance coverage solely provided service or transmitted energy to individual condominium units. For example, Defendants' investigation of the property revealed that the condominium complex did not maintain a central air conditioning system. (Guttenplan Cert. ¶7.) Rather, each of the sixteen condominium units was serviced by its own air conditioning compressor and handler. (<u>Id.</u>) Similarly, while the building did contain a central electric system, each unit was serviced by its own

17

circuit breaker from which the outlets and switches in it received power.  (Id. ¶8.)  Each unit also contained its own domestic water system, which was connected to the main pipe supply and sewer lines.  (Id. ¶9.)

Based on this structure and system layout in the complex, Scottsdale only provided coverage for the central "hubs" of energy, and refused to cover damage to the wires and pipes that serviced individual units.  This satisfied the extent of the coverage that Scottsdale was required to provide under the Amended Master Deed and statute.  Plaintiffs have introduced no evidence that Defendants failed to provide coverage for any portion of a common system that belonged to a centralized hub. Furthermore, the record indicates that Defendants covered a majority of the damage done to the rough carpentry of the building, and only refused to cover damage done to the framing and interior partitions found within the boundaries of a unit as defined by the deed. (Id. ¶ 10.)  As such, there is no dispute evident from the record that the items for which Plaintiff seeks additional insurance coverage are not common elements, and Defendant was therefore not responsible for covering them under the Amended Master Deed.[7]

---

[7] Given the Court's present finding that the HVAC, heating, plumbing, and electric systems that serviced single units did not constitute common elements, it likewise finds that the architectural and engineering fees that Bay Colony incurred as a result of the damage done to these items are not common elements

Notably, it is evident from the record that the purpose of the amendment to the Master Deed was to reduce Bay Colony's insurance costs by decreasing the amount of property for which it was required to purchase coverage.  In fact, in August of 2008, the Association sent a letter to all unit owners in which it unequivocally stated that: "The way the Master Deed document is written, Bay Colony continues to be at risk with increasing insurance premiums. . . . [T]he Association does not wish to be responsible for individual unit owner property damage or insurance.  This is easily remedied by [altering] . . . the Master Deed."  (08/04/08 Letter Re: Proposed Am. Master Deed.) Accordingly, the Association adopted and incorporated into the deed a narrowed definition of "common elements" and an expanded definition of a "unit."  (Am. Master Deed §§ 1E, 3A(1).)  The Association put all unit owners on notice of their increased — and its decreased — insurance responsibility under the Amended Master Deed by way of a letter from the condominium's property manager, in which it was "strongly recommended" that unit owners provide their insurance agents with a copy of the amended deed to ensure that their policies complied with the new definitions. (See 11/19/09 Letter Re: Approved Master Deed Change.) Similarly, Defendants have introduced evidence that the Association sought to reduce its insurance obligations in response to water damage that occurred in 2007.  In e-mails addressing coverage for the

for which Scottsdale was required to provide coverage.

damage, representatives from Bay Colony explicitly stated that "the insurance provisions [] make it clear that the association only insurers the common elements and the unit owners are responsible for their own unit insurance and repair." (Docket No. 22, Defs.' Supp. Mem., Ex. C.)  As such, given that the record here indicates that Plaintiff expressly intended to limit the degree of property for which it was required to purchase insurance coverage, it strains credulity to now find that Plaintiff actually intended to purchase coverage for the entirety of the building's heating, HVAC, plumbing, and electric systems.

Based on the above, the Court finds that the items for which Plaintiff seeks additional insurance proceeds are not common elements.  As such, Bay Colony was not required to purchase — and Scottsdale was not required to provide — insurance coverage for these items in the first place.

**B.   "Covered Equipment" Under the Policy**

Regardless of whether Bay Colony was required to obtain insurance coverage for the building's HVAC, heating, plumbing, and electric systems, it nonetheless contends that these items are expressly covered under the Policy.

Under New Jersey law, "[i]nsurance coverage is a matter of contract law determined by the language of insurance agreements." Ayala v. Assured Lending Corp., 804 F. Supp. 2d 273, 281 (D.N.J. 2011) (citing Longobardi v. Chubb Ins. Co. of N.J., 582 A.2d

1257, 1260 (N.J. 1990)).  When the policy's language is clear and unambiguous, the court is bound to enforce it according to its plain and ordinary meaning.  Stafford v. Scottsdale Ins. Co., 416 F. App'x 191, 194 (3d Cir. 2010) (citing Voorhees v. Preferred Mut. Ins. Co., 607 A.2d 1255, 1260 (N.J. 1992)).[8]  However, if there is any ambiguity with regard to any wording in the policy, the language should be "construed liberally in the insured's favor."  Ayala, 804 F. Supp. 2d at 281(citing Longobardi, 582 A.2d at 1260); see also Zurich Am. Ins. Co. v. Keating Bldg. Corp., 513 F. Supp. 2d 55, 64 (D.N.J. 2007). "A provision of an insurance policy is ambiguous if reasonably intelligent [persons] on considering it in the context of the entire policy would honestly differ as to its meaning." Vlastos v. Sumitoma Marine Fire Ins. Co., 707 F.2d 775, 778 (3d Cir. 1983).  Moreover, when analyzing an insurance policy, the court must view it from the perspective of an average policyholder.  Zurich, 513 F. Supp. 2d at 69; Cont'l Cas. Co. v. Gamble, No. Civ.A.05-5189, 2007 WL 1657107, at *4 (D.N.J. June 5, 2007)(citing Morrison v. Am. Int'l

---

[8] It is well recognized that insurance policies may be afforded a different interpretation if their ordinary meaning is clear, but is "'inconsistent with public expectations and commercially accepted standards.'" Ayala, 804 F. Supp. 2d at 281 (quoting Werner Indus. v. First State Ins. Co., 548 A.2d 188, 191 (N.J. 1988) (further citation omitted)).  Neither party here disputes, however, that the Policy at issue is commercially acceptable and consistent with public expectations.  As such, the Court sees no reason for this exception to apply to the present circumstances.

<u>Ins. Co. of Am.</u>, 887 A.2d 166, 169 (N.J. Super. 2005)(internal citations omitted)).

In accordance with these principles of law, the Court turns to the relevant provisions of the insurance policy agreement between Plaintiff and Defendant Scottsdale.  The opening paragraph of the Policy states that:

> [Scottsdale] will pay for direct physical loss of or damage to Covered Property at the premises . . . caused by or resulting from any Covered Cause of Loss.

(Scottsdale Ins. Policy at 1.) This language clearly and unambiguously indicates that Scottsdale need only provide insurance coverage for property: (1) that is covered under the insurance policy, and (2) that is lost or damaged due to a cause specifically defined in the Policy.

In the text of the Policy, "covered property" is defined to include: "permanently installed machinery and equipment" within "the building or structure."  (<u>Id.</u>)  The Policy also provides that an item of "equipment" will only be covered if it "generates, transmits or utilizes energy . . . or which, during normal usage, operates under vacuum or pressure[.]" (<u>Id.</u> at 20.) Notably, the Policy states that "sewer piping" and "water piping" are excluded from the definition of "covered equipment."  (<u>Id.</u>) As such, it is clear and unambiguous from these words that the building's plumbing system is not considered to be an item of equipment covered by the Policy.

22

Aside from the building's plumbing system, however, Plaintiff also claims that the HVAC, heating, and electric systems constitute equipment covered by the Policy.  On the one hand, these items could conceivably fall within the definition of "covered equipment" because they "generate," "transmit," and/or "utilize" energy.  On the other hand, however, in order to receive insurance coverage, the item in question must be both covered under the Policy and damaged as a result of a cause specifically listed in it.  (Id. at 1.)  On this point, the Policy indicates that Scottsdale will only pay for loss or damage that was the "direct result of an 'accident.'" (Id. at 16.)  An "accident" is defined as: "a fortuitous event that causes direct physical damage to 'covered equipment.'" (Id. at 20.)  More specifically, the "event" giving rise to the "accident" must be one of the following:

> (a) Mechanical breakdown, including rupture or bursting caused by centrifugal force;
> (b) Artificially generated electric current; . . .
> (c) Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by [Bay Colony] or operated under [its] control;
> (d) Loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition caused by [Bay Colony] or resulting from any condition or event inside such equipment; or
> (e) Loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

(Id. at 16.) None of these events occurred in the instant case. Rather, the damage here solely resulted from a fire.

23

Therefore, even if the condominium's HVAC, heating, and electric systems could fall within the definition of "covered equipment," these items nonetheless are not entitled to coverage because the damage done to them was not the direct result of an "accident" as that term is defined under the Policy.[9]

Given that the language of Bay Colony's insurance agreement with Scottsdale is clear and unambiguous as to the extent of insurance coverage provided for "covered equipment," the Court is bound to enforce it according to this plain and ordinary meaning.[10]   See Stafford, 416 F. App'x 191, 194 (3d Cir. 2010)

---

[9] Plaintiff further avers that: "Although a fire loss is not specifically referenced in this section, a fire loss is not mentioned as an exclusion in Section 2 of this portion of the Policy[.]" (Pl.'s Statement of Facts ¶ 39.)  In essence, Plaintiff appears to invoke the doctrine of negative implication by arguing that, since a fire is not expressly excluded as a cause of loss under the Policy, it must be included as an insurable loss.  It has previously been recognized, however, that merely excluding an item from an insurance policy does not by implication include it.  See K & Lee Corp. v. Scottsdale Ins. Co., 769 F.Supp. 870, 874 (E.D. Pa. 1991) (citing David v. Nat'l Union Fire Ins. Co., 211 A.2d 66 (Pa. Super. 1965)).  As such, the Court declines to afford further consideration to Plaintiff's argument on these grounds.

[10] Plaintiff argues that New Jersey law requires the terms of an insurance policy to be interpreted liberally in favor of the insured — in this case, Bay Colony.  This legal principle, however, only applies to ambiguities residing in the language of an insurance policy.  See Ayala v. Assured Lending Corp., 804 F. Supp. 2d 273, 281 (D.N.J. 2011).  In fact, the case upon which Plaintiff extensively relies, County of Hudson v. Selective Insurance Company, 752 A.2d 849(N.J. Super. 2000), expressly recognizes this point: "[I]t is fundamental that ambiguities in an insurance policy are to be interpreted in favor of the insured[.]" Id. at 852 (internal quotation marks and citation omitted).

(citing Voorhees, 607 A.2d at 1260).  As such, the Court finds in favor of Defendants that the condominium complex's HVAC, plumbing, electrical, and heating systems do not constitute "covered equipment" under the Policy.

**IV.  CONCLUSION**

For the reasons set forth above, the Court will deny Plaintiff's Motion for Summary Judgment.  Defendants' Cross-Motion for Summary Judgment will be granted with respect to Count I of Plaintiff's Complaint, but will be denied without prejudice with leave to re-file at a later date as to the remaining four counts.

An Order consistent with this Opinion follows.


                                        /s/ Noel L. Hillman
At Camden, New Jersey             NOEL L. HILLMAN, U.S.D.J.

Dated:  December 26, 2012

---

In the instant case, there is no ambiguity in the Policy's language.  Rather, as discussed in detail above, it is clear and unambiguous from the Policy's terms that the HVAC, plumbing, electric, and heating systems in Plaintiff's condominium complex are not equipment covered under the agreement.